IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 13, 2004 Session

## JOHN EDWARD BELL, JR. v. VICKIE LEE BELL

An Appeal from the Chancery Court for Tipton County
No. 19,069     Dewey C. Whitenton, Chancellor

No. W2004-00131-COA-R3-CV - Filed February 22, 2005

This is a child custody dispute. The parties were married and had one child. When the child was approximately three years old, the father filed a petition for divorce and was granted temporary custody. A year and a half later, the trial court granted the parties a divorce by stipulation, but reserved the issue of permanent custody. After a hearing, the trial court granted the father primary residential custody, with the child to reside with the mother three weekends out of the month plus additional time. The mother now appeals, arguing that the trial court failed to engage in a comparative fitness analysis and failed to consider evidence that the father had abused the mother during their marriage. After a careful review of the record, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Linda L. Holmes, Memphis, Tennessee, for the appellant, Vickie Lee Bell.

Duke H. Brasfield, Covington, Tennessee, for the appellee, John Edward Bell, Jr.

### OPINION

Petitioner/Appellee John Edward Bell ("Father") and Respondent/Appellant Vickie Lee Bell ("Mother") were married in September 1995. The parties had one child during the marriage, a daughter, Remington Lee Bell ("Remington"), born December 28, 1997.

The parties separated on October 24, 2000. At that time, Mother obtained an order of protection against Father based on allegations of verbal and physical abuse. Consequently, Father moved from the marital home. Remington remained in the home with Mother.

On December 4, 2000, Father filed a petition for divorce in the trial court below on grounds of irreconcilable differences and inappropriate marital conduct. Father averred that Mother had

abandoned and vandalized the marital home. In the petition, he asserted that Mother had been reported by employees of a nearby grocery store as being "in a state or condition which cause[d] them to be concerned" about the safety of the parties' child. The employees reportedly called the Sheriff's department to alert them that the minor child might be in danger. Based on those allegations, on the day Father's petition was filed, the trial court awarded Father temporary custody of Remington pending the outcome of the litigation. On January 22, 2001, Mother filed an answer to Father's petition, admitting the statistical allegations and irreconcilable differences but denying the other allegations in the complaint. Both parties sought primary custody of Remington.

On April 1, 2002, the trial court held a hearing on the matter. The record on appeal does not include a transcript of that hearing. On June 24, 2002, the trial court entered an order declaring the parties to be divorced by stipulation, but reserving the issue of custody and other matters. Temporary custody of Remington remained with Father, and Mother was given visitation on every weekend. Though Mother's visitation was unsupervised, the trial court ordered the Carl Perkins Center or Department of Children's Services to check on the status of the child with Mother each month until the matter was further reviewed by the trial court.[1] Mother was ordered to pay $240 per month in temporary child support to Father.[2] In addition, the trial court ordered both parties to undergo drug testing and psychological evaluations.

On November 20, 2003, the trial court held another hearing. Both of the parties' drug test results and psychological evaluations were made exhibits at the hearing. Both parties' drug tests were negative, but Father's test was shown to be severely diluted.

Both Father and Mother testified at the hearing. Father testified first, indicating that he was employed by the City of Bartlett, working from 7:00 a.m. until 4:00 p.m. five days a week. At that time, Remington was in kindergarten. She went to before-care and after-care programs at her school, and Father took her to school and picked her up every day. Father testified that, after school, Remington does her homework, takes a bath, lays out her clothes for the next day, watches television, says her prayers, and then goes to bed around 9:00 p.m. He acknowledged that his mother occasionally takes care of Remington, but not on a regular basis. Father said that he was responsible for all of Remington's meals and attended her school parent-teacher conferences. Either Father or his mother took Remington to the doctor as needed, and Father said that he paid Remington's medical bills.

Father testified that he had repeatedly tried to talk with Mother, but that she refused to discuss with him anything regarding Remington, such as her medical needs, school, or Girl Scout program. Father asserted that Mother refused to give him her telephone number or her address. He stated that the only time he talked to Mother was during brief moments at the Covington Police

---

[1] The record contains no evidence that Mother's visits with Remington were ever monitored or checked pursuant to this order.

[2] On September 12, 2002, the trial court entered a consent order reducing Mother's child support to $170 per month. Matters involving child support are not at issue in this appeal.

Department when the parties dropped off or picked up Remington. When asked whether Mother knows what school Remington attends, Father replied that he has "no idea," because Mother refuses to discuss anything with him. Father said that neither party had the other's telephone number, but claimed that Mother had never requested such information from him.

Father conceded that he and Mother had a "rough marriage," but claimed that his animosity towards her was all in the past. He admitted that he is a "confirmed alcoholic," but acknowledged that he drinks "[o]n occasion" and that he "might have a beer occasionally, cooking on the grill." He said that he does not drink when Remington is with him.

Mother also testified at the hearing. Mother has a twelfth-grade education and attended State Tech Institute in Memphis. She said that she complied with the trial court's order requiring her to attend counseling sessions and to undergo drug testing and a psychological evaluation. She moved from Tipton County to a house in Lauderdale County, where she lived alone.

Mother was laid off at her job at World Color Press. She had obtained other employment at a local grocery store, earning approximately $200 per week, but quit working at the grocery store so that she could exercise her weekend visitation with Remington. Consequently, at the time of the hearing, she was unemployed. Mother had begun babysitting the children of a friend, Jennifer Glover ("Glover"), but was uncertain as to how much she earned babysitting, claiming that she often babysat for free because Glover's children and Remington were friends. At the time of the hearing, Mother said that she was receiving $100 per week in unemployment insurance. Mother indicated that she was able to afford to make it on $100 per week because she was a good money manager. Mother testified that she was current with her bills, but admitted that she was in arrears on her child support payments.

Mother asserted that, although she drank alcohol on occasion during her marriage, she had not had a drink since her divorce. She also said that she did not use any kind of drugs.

Mother testified that her mother was deceased, but her father lives in Memphis, and that she and Remington saw him every weekend. Mother asserted that there was a time period of approximately a month and a half in which she could not locate Father and Remington. Other than that period, Mother said, she had had Remington with her every weekend.

Mother said that she loves Remington, and that Remington is a wonderful child. Mother said that she cooks nutritious food for Remington and takes care of her when she is sick. Mother said that she had had difficulty seeing Remington during the week, and claimed that Father had not given her any information about Remington's school or her medical problems. She denied that Father had ever tried to talk with her about matters involving Remington. She also denied Father's assertion that she refused to give Father her telephone number, stating that she had given him the number when the two were divorced in April 2002.

In addition, John Bell, Sr. ("Bell"), Father's father, testified at the hearing. Bell stated that he saw Father on an average of once a week, and that Father was very capable of taking care of Remington. He said that Father took care of all of Remington's needs, including cooking and doing the laundry.

Jennifer Glover, Mother's friend, also testified. Glover said that, on occasion, Mother babysat her two children, ages five and seven, while Glover was at work. She said that Mother's home was spotless, and that she was a good housekeeper. Glover testified that Mother is devoted to Remington and has a wonderful relationship with her. Glover said her children loved going to Mother's home, and maintained that she trusted Mother with her children completely.

Paul Newsom ("Newsom"), Mother's father, testified on Mother's behalf. Newsom said that he visited Mother's house every weekend to see Remington. He said that he had not seen Mother drink any alcohol or take any drugs since she separated from Father. Newsom said that Mother was a good parent to Remington, and that Remington loved going to Mother's house on the weekends. He said that he had seen Remington cry on two occasions when she had to go back to Father's house after spending her weekend with Mother.

At the conclusion of the hearing, the trial court issued an oral ruling, stating: "I know you love this child or you wouldn't be here." The trial court expressed deep concern about the lack of communication between the parties. The trial court stated:

> This poor child is caught in the middle of this situation. It's not the child's fault that you all have gotten this divorce. It's not the child's fault that this matter has digressed into a real problem area. . . . There's no perfect way to do this. You know, we can't cut the child in half, so the child has to be with one or the other of you.

In light of this concern, the trial court ordered the parties to continue counseling on parenting and communication. The trial court then stated that it would enter a permanent parenting plan designating Father as the primary residential parent. On December 11, 2003, the trial court entered an order consistent with its oral ruling. As noted in the oral ruling, a permanent parenting plan was entered designating Father as the primary residential parent, and stating that Mother would be entitled to parenting time on three weekends out of the month plus overnight visitation one day during two separate weeks of each month. Mother was also awarded primary residential parenting time during the entire month of July. From that order, Mother now appeals.[3]

On appeal, Mother argues that there is no indication in the record that the trial court engaged in a comparative fitness analysis or considered the relevant factors pursuant to Tennessee Code Annotated § 36-6-106(a) (regarding a custody determination) or § 36-6-404(b) (regarding a permanent parenting plan) in making its conclusion. Rather, Mother asserts, the trial court simply

---

[3]Mother's current appellate counsel did not represent Mother at the trial court level.

concluded that the parties were unable to communicate, without addressing the relative fitness of the parties or the best interest of the child. In addition, Mother claims that the trial court erred in failing to consider Father's past abuse of Mother.

We review the trial court's findings of fact *de novo*, presuming those findings to be correct unless the evidence preponderates otherwise. ***Hass v. Knighton***, 676 S.W.2d 554, 555 (Tenn. 1984); ***Nelson v. Nelson***, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001); Tenn. R. App. P. 13(d). Questions of law are to be reviewed *de novo*, with no such presumption of correctness. ***Nelson v. Nelson***, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001). Nevertheless, decisions involving matters of child custody are "factually driven and require the careful consideration of numerous factors." ***Adelsperger v. Adelsperger***, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). Because the trial court had the benefit of observing the demeanor of the two parents and the other witnesses, the trial court is given wide discretion in determining such matters. ***Mayberry v. Mayberry***, No. M2002-00424-COA-R3-CV, 2003 WL 21392193, at *2 (Tenn. Ct. App. June 17, 2003).

First, Mother argues that there is no indication that the trial court considered the relevant statutory factors in designating Father as Remington's primary residential parent. She points out that the trial court did not mention the relevant statutes, but instead placed undue importance on the fact that the parties "have got to learn to communicate with each other and apparently that has not happened." Furthermore, Mother argues, the final order designating Father as primary residential parent failed to mention any specific statutory factors upon which the decision was based. Mother claims it is error for the trial court to designate a primary residential parent without first conducting a best interest analysis by applying the statutory factors set forth in Tennessee Code Annotated § 36-6-106(a) or § 36-6-404(b). ***See Bah v. Bah***, 668 S.W.2d 663, 666 (Tenn. Ct. App. 1983) (endorsing a "comparative fitness" analysis); *see also* ***Houston v. Houston***, No. W2002-02022-COA-R3-CV, 2003 WL 22326970, at *8 (Tenn. Ct. App. May 29, 2003) (holding that the trial court placed too much weight on the children's stated preference to live with the mother and failed to apply factors in section 36-6-106); ***P.E.K. v. J.M.***, No. M2001–02190-COA-R3-CV, 2002 WL 1869416, at *9 (Tenn. Ct. App. Aug. 15, 2002) (noting that trial court failed to conduct best interest analysis and must be reversed). On this basis, Mother claims, the trial court's decision must be reversed.

As noted by Mother, the trial court was obligated to consider the applicable statutory factors in Section 36-6-106(a) in reaching its decision regarding the comparative fitness of the parties.[4] ***See***

---

[4]This statute sets out factors that a trial court should consider in making an award of custody, including:

(1) The love, affection and emotional ties existing between the parents and child;

(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that where there is a finding, under § 36-6-106(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1- 602, by one (1)

(continued...)

***Burnette v. Burnette***, E2002-01614-COA-R3-CV, 2003 WL 21782290, at *6 (Tenn. Ct. App. July 23, 2003). "However, the statute does not require a trial court, when issuing a memorandum opinion or final judgment, to list every applicable factor along with its conclusion as to how that particular factor impacted the overall custody determination." ***Id.*** Moreover, not every factor is applicable in a given case, and the trial judge is required to consider only the factors which are applicable. ***Id.***; *see also **Mueller v. Mueller***, W2004-00482-COA-R3-CV, 2004 WL 2609197, at *6 (Tenn. Ct. App. Nov. 17, 2004).

In this case, the trial court had ordered drug testing and psychological evaluations of both Mother and Father in order to assist the court in evaluating the comparative fitness of the parties. The results, especially of the psychological evaluations, support the trial court's decision. The parties fully presented their arguments to the trial court, particularly at the November 2003 hearing that focused on the issue of custody. At the hearing, evidence was presented from which the trial court could conclude that Mother was more at fault for the parties' failure to communicate regarding Remington. In addition, two factors weighing in favor of designating Father as primary residential

---

[4](...continued)

parent, and that a non-perpetrating parent has relocated in order to flee the perpetrating parent, that such relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that where there are allegations that one (1) parent has committed child abuse, [as defined in § 39-15-401 or § 39- 15-402], or child sexual abuse, [as defined in § 37-1-602], against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected thereto. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106(a) (2001).

parent were undisputed. First, Father had stable employment, while Mother was unemployed and was in arrears in her child support payments. Second, Father had been the primary residential parent since December 2000, and had provided Remington with a stable, satisfactory environment. Under these circumstances, the trial court was not obligated to delineate each and every factor upon which it relied in evaluating the comparative fitness of the parties.

Mother argues, however, that the trial court placed too little weight on Father's admitted abuse of Mother during their marriage. The only evidence upon which Mother relies in support of this argument is the following statement in Father's deposition:

Q. Okay. So the thing that broke you up, that put you apart, was an order of protection?
A. Yes, sir.
Q. What did she claim you did?
A. Physical and verbal abuse is how it was written down on it.
Q. Did you do that?
A. Verbal, some physical, yes, sir. There was times I would grab her arm and things, yes, sir.

Mother argues that, despite this admission, the trial court failed to mention the issue of abuse or make any finding regarding the issue. She asserts that the trial court was required to do so under Section 36-6-106(a)(8). That section provides that past abuse is a factor to be considered by the trial court, and states:

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that where there are allegations that one (1) parent has committed child abuse, [as defined in § 39-15-401 or § 39- 15-402], or child sexual abuse, [as defined in § 37-1-602], against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. ***The court shall include in its decision a written finding of all evidence, and all findings of facts connected thereto.*** In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings . . . .

Tenn. Code Ann. § 36-6-108(a)(8) (2001) (emphasis added). Mother notes that the trial court failed to issue specific findings of fact regarding Father's abuse of Mother, and that such specific findings were mandated under the emphasized portion of this subsection.

This Court has recently interpreted the "written finding" requirement as applying only to allegations involving child abuse, not to the alleged abuse of another adult. ***Joiner v. Griffith***, No. M2003-00536-COA-R3-JV, 2004 WL 1334519, at *7 (Tenn. Ct. App. June 14, 2004). In addition, the deposition testimony on which Mother relies provides little probative information about Father's alleged abusive conduct or the surrounding circumstances. It is difficult to envision the "specific findings" the trial court could have made, based on such vague, minimal evidence. It certainly does

not outweigh the remaining evidence at the hearing, particularly the results of the parties' psychological evaluations. In light of this, we cannot conclude that the trial court committed reversible error in failing to issue any written findings regarding Father's alleged spousal abuse. After an overall review of the evidence, we agree with the trial court's designation of Father as primary residential parent.

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant Vickie Lee Bell, and her surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE